# United States Court of Appeals
### For the Eighth Circuit
_____

No. 23-1114
_____

United States of America

*Plaintiff - Appellee*

v.

Devonte Antonio Veasley

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: November 2, 2023
Filed: April 17, 2024
_____

Before GRUENDER, STRAS, and KOBES, Circuit Judges.
_____

STRAS, Circuit Judge.

Devonte Veasley pleaded guilty to possessing a firearm—a federal offense for someone who is using or addicted to a controlled substance. *See* 18 U.S.C. § 922(g)(3). The question is whether criminalizing this conduct *always* violates the Second Amendment. The answer is no, so we reject Veasley's facial challenge to the statute.

## I.

A drug deal went sideways when, rather than going through with it, Veasley pulled out a handgun and shot at his dealer. After the attack, the government charged him with possessing a firearm while "unlawful[ly] us[ing]" a "controlled substance." *Id.*

A month after he pleaded guilty, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, which concluded that a New York law requiring "proper cause" to carry a firearm violated the Second Amendment. 597 U.S. 1, 12–13 (2022). It was inconsistent with "this Nation's historical tradition of firearm regulation." *Id.* at 17.

Inspired by *Bruen*, Veasley asks us to reach the same conclusion about 18 U.S.C. § 922(g)(3), the federal drug-user-in-possession statute. He believes the district court[1] should have allowed him to withdraw his plea or dismissed the indictment. The court did neither, however, leaving him with only one option: challenging the facial constitutionality of the statute. *See United States v. Nunez-Hernandez*, 43 F.4th 857, 860 (8th Cir. 2022) (clarifying that a guilty plea does not foreclose "arguments that a criminal statute underlying a conviction is facially unconstitutional"); *United States v. Seay*, 620 F.3d 919, 922 n.3 (8th Cir. 2010) (explaining why a guilty plea forecloses an as-applied constitutional challenge). His facial challenge is now before us.

## II.

Section 922(g)(3) prohibits anyone "who is an unlawful user of or addicted to any controlled substance" from possessing a "firearm or ammunition." 18 U.S.C. § 922(g)(3). The penalties for a violation can be heavy, up to 15 years in prison.

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

*See id.* § 924(a)(8).  Even more for career offenders.  *See id.* § 924(e).  Whether this scheme is constitutional is a legal question subject to de novo review.  *See Seay*, 620 F.3d at 923; *see also United States v. Sitladeen*, 64 F.4th 978, 983 (8th Cir. 2023) (reviewing the denial of a motion to dismiss an indictment de novo); *United States v. Seys*, 27 F.4th 606, 610 (8th Cir. 2022) (reviewing the denial of a motion to withdraw a guilty plea for an abuse of discretion).

This is not the first time we have examined § 922(g)(3)'s constitutionality. We have, for example, entertained a Fifth Amendment void-for-vagueness challenge.  The statute survived because of a "judicially[ ]created temporal nexus between the gun possession and regular drug use," *United States v. Carnes*, 22 F.4th 743, 748 (8th Cir. 2022) (citation omitted), but we left the door open for as-applied challenges, *see, e.g.*, *United States v. Turner*, 842 F.3d 602, 604–05 (8th Cir. 2016).

Another set of challenges, like the one here, focuses on the Second Amendment.  *See, e.g.*, *Seay*, 620 F.3d at 922.  A two-part test, based on "text and historical understanding," governs them.  *Bruen*, 597 U.S. at 26; *see District of Columbia v. Heller*, 554 U.S. 570, 576–78, 628–32 (2008).  Step one provides the textual threshold: does a law prohibit "conduct" that "the Second Amendment's plain text covers"?  *Bruen*, 597 U.S. at 17.  Crossing that threshold leads to step two, "historical understanding": is "the regulation . . . consistent with this Nation's historical tradition of firearm regulation"?  *Id.*; *see Sitladeen*, 64 F.4th at 985.  If it is, then the statute "pass[es] constitutional muster."  *Bruen*, 597 U.S. at 30.

Constitutional challenges like these come in two varieties.  The first is as-applied, which requires courts to examine a statute based on a defendant's individual circumstances.  *See United States v. Lehman*, 8 F.4th 754, 757 (8th Cir. 2021).  If a frail and elderly grandmother uses marijuana for a chronic medical

condition a day before possessing a gun, for example, the constitutional analysis will consider only those circumstances, not what a different defendant might do.[2]

A facial challenge, the only type still available to Veasley, goes further. As the Supreme Court has explained, "[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in *all* its applications," regardless of the individual circumstances. *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (emphasis added). The stakes are higher in a facial challenge, so the bar goes up as well: there must be, as Veasley acknowledges, "no set of circumstances . . . under which [§ 922(g)(3)] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (noting that "a facial challenge must fail where the statute has a plainly legitimate sweep" (citation omitted)). If some applications are constitutional, then facially speaking, the statute is too. *See, e.g., United States v. Stephens*, 594 F.3d 1033, 1038 (8th Cir. 2010) (holding that a defendant's "facial challenge . . . fails because . . . . [o]ne can imagine many defendants [to] whom" the statute could constitutionally apply); *Antonyuk v. Chiumento*, 89 F.4th 271, 314 (2d Cir. 2023) (rejecting a facial *Bruen* challenge to a licensing scheme requiring good moral character because "[t]here are applications of the character provision that would be constitutional").

These differences have practical consequences. An as-applied challenge would focus only on Veasley: is applying "the regulation" to *his* conduct "[in]consistent with this Nation's historical tradition of firearm regulation"? *Bruen*, 597 U.S. at 17. To counter a facial challenge, by contrast, all the government must

---

[2]It is true that we have held that there is no need for "felony-by-felony litigation regarding the constitutionality of" a statute prohibiting the possession of firearms by felons. *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). Key to that decision were the "assurances by the Supreme Court" that nothing in *Heller* or *Bruen* "cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 501–02 (quoting *Heller*, 554 U.S. at 626). Here, by contrast, the Supreme Court has made no such "assurances" about "prohibitions" on drug users and addicts. *Id.*

do is identify constitutional applications—even if they are unrelated to Veasley's conduct—using the same text-and-historical-understanding framework. *See id.* at 33–34; *United States v. Raines*, 362 U.S. 17, 22 (1960) (cautioning courts not to "pronounc[e] an Act of Congress unconstitutional" when constitutional applications exist).

In effect, Veasley is speaking for a range of people. On its face, § 922(g)(3) applies to everyone from the frail and elderly grandmother to regular users of a drug like PCP, which can induce violence. *See United States v. Daniels*, 77 F.4th 337, 355 (5th Cir. 2023) (concluding that a marijuana user's § 922(g)(3) conviction was inconsistent with the history and tradition of firearms regulation); *see also* Mim J. Landry, *Understanding Drugs of Abuse: The Processes of Addiction, Treatment, and Recovery* 108 (1994) ("PCP toxicity may include combative hostility, paranoia, depersonalization, and violence . . . ."). In a prior case, we concluded that a facial challenge could not succeed. *See Seay*, 620 F.3d at 925. *Bruen* has supplemented the analysis, but it has not changed the answer. *See Jackson*, 69 F.4th at 501–06 (undertaking the historical analysis "endorsed by *Bruen*" rather than just relying on two post-*Heller* decisions, *United States v. Adams*, 914 F.3d 602, 607 (8th Cir. 2019) and *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011)); *cf. Sitladeen*, 64 F.4th at 985–87 (concluding that a pre-*Bruen* precedent only remained binding because it "did *exactly*" what "*Bruen* [now] tells us to" (emphasis added)).

### III.

In this appeal, we assume that § 922(g)(3) "governs conduct that falls within the plain text of the Second Amendment." *Sitladeen*, 64 F.4th at 985; *see* U.S. Const. amend. II. That is, drug users "are part of 'the people' whom the Second Amendment protects," and "handguns are weapons 'in common use' today." *Bruen*, 597 U.S. at 31–32. So "we proceed to ask whether [§ 922(g)(3)] fits within America's historical tradition of firearm regulation." *Sitladeen*, 64 F.4th at 985.

## A.

It makes sense to start with the closest "historical analogue," *Bruen*, 597 U.S. at 30, which is the regulation of intoxicating substances. Alcohol and drug abuse have been "general societal problem[s]," *id.* at 26, for thousands of years. *See* Hanan Hamdi et al., *Early Historical Report of Alcohol Hepatotoxicity in* Minooye Kherad, *a Pahlavi Manuscript in Ancient Persia, 6th Century CE*, 13 Caspian J. Internal Med. 431, 431 (2022) ("[S]everal kinds of alcoholic beverages have been . . . abused by humans for thousands of years . . . . [A]rchaeological and historical evidence revealed that the fermentation of grains into beer . . . dated back about 20,000 years as an ancient custom." (Internal citations omitted)). Colonial times were no exception. *See Bruen*, 597 U.S. at 26. Physician Benjamin Rush, a signer of the Declaration of Independence, recognized that alcohol can be so addictive that some drinkers "can afford scarcely any marks of remission either during the day or the night." Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind* 8 (8th ed., Boston, James Loring 1823); *see* Karl Mann et al., *One Hundred Years of Alcoholism: The Twentieth Century*, 35 Alcohol & Alcoholism 10, 10 (2000).

Other drugs were around then too. The use of opioids was common. First introduced in the 17th century, the "formulation known as 'laudanum' (i.e., tincture of opium) . . . incorporate[d] opium along with other ingredients, such as cinnamon, clover, and saffron, in Spanish wine." Enrique Raviña, *The Evolution of Drug Discovery: From Traditional Medicine to Modern Drugs* 11 (2011); *see* J. K. Crellin, *Domestic Medicine Chests: Microcosms of 18th and 19th Century Medical Practice*, 21 Pharmacy in Hist. 122, 126 (1979) (noting that 18th-century medicine chests contained opiates and laudanum). Cannabis was in use too. *See* Martin Booth, *Cannabis: A History* 70 (2003) (describing the widespread use of hemp and recognition of its psychoactive properties). And so were natural hallucinogens. *See generally* Martin Nesvig, *Forbidden Drugs of the Colonial Americas*, *in* The Oxford Handbook of Global Drug History 153–75 (Paul Gootenberg ed., 2022) (discussing the use of ayahuasca, peyote, and hallucinogenic mushrooms in colonial America).

Many of these drugs, and others like them, remain a problem today. When a "challenged regulation [like § 922(g)(3)] addresses a general societal problem that has persisted since the 18th century," like substance abuse, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27. Our task is to figure out whether § 922(g)(3) looks like anything that "earlier generations" did to keep firearms out of the hands of drug and alcohol users. *Id.* at 26.

For drinkers, the focus was on the use of a firearm, not its possession. And the few restrictions that existed during colonial times were temporary and narrow in scope. One came from Virginia, which banned "shoot[ing] any gunns at drinkeing." Act XII of Mar. 10, 1655, *reprinted in 1 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619*, at 401, 401–02 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823). Another from New York, which prohibited firing guns for the three days bracketing New Years, December 31 to January 2, because of the "great Damages" done by those "intoxicated with Liquor." Act of Feb. 16, 1771, ch. 1501, *reprinted in 5 The Colonial Laws of New York from the Year 1664 to the Revolution* 244, 244–45 (Albany, James B. Lyon 1894). Disarmament, on the other hand, was not an option.[3] *See Daniels*, 77 F.4th at 345–46 (surveying Founding-era statutes and concluding they were "limited in scope and duration" when it came to guns and alcohol, different from the way § 922(g)(3) operates).

---

[3]It only became one toward the end of the 19th century. *See, e.g.*, Act of Apr. 3, § 3, 1883 Wis. Sess. Laws 290 (forbidding any person in a "state of intoxication" from going "armed with any pistol or revolver"); Act of Feb. 17, § 1, 1909 Idaho Sess. Laws 6 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks").

There was even less regulation when it came to drugs. "[T]housands of . . . Americans at the time[] had become dependent on opium," Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America, 1776-1914*, at 20 (2023), and lawmakers were certainly aware of the problem. Senator John Randolph of Virginia was a user. *See id.* at 20–21. And so was Senator Robert Goodloe Harper's mother-in-law, who died of laudanum dependency. *See id.* at 21. Founding Father Rufus King, also a senator, wrote letters to his doctor lamenting his sister's opium dependency, including how it impaired her ability to care for her children. *Id.* Laudanum even held Thomas Jefferson in its grip for a while after he left the presidency. *See* John M. Holmes, *Thomas Jefferson Treats Himself: Herbs, Physicke, & Nutrition in Early America* 35–36 (1997). In a letter, Jefferson stated that "with care and laudanum I may consider myself in what is to be my habitual state." Letter from Thomas Jefferson to Robey Dunglison (Nov. 17, 1825), *in The Jefferson-Dunglison Letters* 41, 42 (John M. Dorsey ed., 1960).

Despite the widespread use of opium in particular, the government concedes that its "review of early colonial laws has not revealed any statutes that prohibited [firearm] possession" by drug users. In fact, the "general societal problem" of drug addiction did not receive congressional attention until 1909. *See* Smoking Opium Exclusion Act of 1909, Pub. L. No. 60-221, 35 Stat. 614; *see also* Harrison Narcotics Tax Act, Pub. L. No. 63-223, 38 Stat. 785 (1914). And drug use went unmentioned in the National Firearms Act, which Congress passed almost 25 years later. *See* Pub. L. No. 73-474, 48 Stat. 1236 (1934). Instead, it took until 1968, with the passage of § 922(g)(3), for Congress to keep guns away from drug users and addicts.

The lesson here is that disarmament is a modern solution to a centuries-old problem. The fact that "earlier generations addressed the societal problem . . . through materially different means . . . [is] evidence that" disarming *all* drug users, simply because of who they are, is inconsistent with the Second Amendment. *Bruen*, 597 U.S. at 26.

B.

The key word is *all*. As *Bruen* itself recognizes, "the Constitution can, *and must*, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28 (emphasis added). Modern synthetic drugs present a "dramatic technological change[]." *Id.* at 27. James Madison never experimented with methamphetamine, Benjamin Franklin did not dabble in PCP, and Thomas Jefferson did not use fentanyl to take the edge off the day. Today's drugs are different than the opiates and cannabis of the past. They are, in a word, "unprecedented." *Id.*

When it comes to regulations "implicating unprecedented societal concerns," *Bruen* is clear that we cannot look at history through a pinhole. *Id.* Rather, we must take "a more nuanced approach," again "reasoning by analogy," to determine whether there is "a well-established and representative historical analogue" that could make § 922(g)(3) constitutional in some of its applications. *Id.* at 27–30; *see Raines*, 362 U.S. at 22. It turns out there is.

1.

Our expanded search begins with the mentally ill. "Obviously, mental illness and drug use are not the same thing. But there is an intuitive similarity" because their behavioral effects overlap. *Daniels*, 77 F.4th at 349; *compare* Tatiana Ramey & Paul S. Regier, *Cognitive Impairment in Substance Use Disorders*, 24 CNS Spectrums 102, 103–05 (2019) (noting that the typical effects of substance abuse are "attentional bias [to] drug seeking," "impairment[] in inhibitory control," "[w]orking memory impairment[]," and "poor decision-making"), *with* Yafen Wang et al., *Cognitive Impairment in Psychiatric Diseases: Biomarkers of Diagnosis, Treatment, and Prevention*, 16 Frontiers Cellular Neuroscience, Nov. 2, 2022, at 2 (listing "notable deficits in the speed of processing, working memory, attention/vigilance, verbal learning, visual learning, reasoning and problem-solving, and social cognition" as manifestations of mental illness). The fact that the analogy works for some, and that the mentally ill sometimes lost their guns, means that § 922(g)(3)

cannot be facially unconstitutional. *See Salerno*, 481 U.S. at 745 (applying the no-set-of-circumstances test).

The legal view of mental illness in the 18th century was different than it is now. Many believed it to be a transitory condition, just like intoxication. As Blackstone put it, "lunatic[s] . . . *had* understanding, but . . . hath lost the use of . . . reason." 1 William Blackstone, Commentaries *294 (emphasis added). The common belief was that they had "lucid intervals" or periods during which they "enjoy[ed] [their] senses." *Id.* Under that view, they were never "looked upon as irrecoverable." Anthony Highmore, *A Treatise on the Law of Idiocy and Lunacy* 104 (London, R. Wilks 1807); *see also id.* at 105 (characterizing lunacy as "periods of imbecility"); 1 Blackstone, Commentaries *294 (explaining that "the law always imagines . . . [their] accidental misfortunes may be removed").

The law described intoxication in the same rudimentary way, with almost identical terminology. Consider Thomas Cooley, who described drunkenness as a form of "temporary insanity." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 599 n.2 (2d Ed., Boston, Little, Brown, & Co. 1874). Or Benjamin Rush, who viewed it as a "temporary fit of madness." Rush, *supra*, at 6. The same went for drug addiction, even though the scientific understanding of it was still evolving at the time. *See* Gray, *supra*, at 20 (describing a patient who suffered "[i]nsanity from the use of [o]pium" and ended up institutionalized).

The similarities did not stop there. Just like the intoxicated kept their civil liberties, including the right to possess firearms, the mentally ill frequently did too. Those who posed no danger stayed at home with their families, and their civil liberties remained intact. *See* Gerald N. Grob, *Mad Among Us* 7 (1994) ("Before the American Revolution . . . . [t]he care of the insane remained a family responsibility."); *id.* (explaining that "so long as [family] members could provide the basic necessities of life for afflicted relatives, no other arrangements were required").

-10-

Life was different, however, for those who were both mentally ill and dangerous. *See* Albert Deutsch, *Public Provision for the Mentally Ill in Colonial America*, 10 Soc. Serv. Rev. 606, 606 (1936). They "were confined in barred cells in the basement," and "particularly violent individuals" were "restrained . . . using a 'strait-waistcoat' or 'mad shirt,' or heavy arm and leg chains." Lynn Gamwell & Nancy Tomes, *Madness in America* 20 (1995). It should come as no surprise that confinement did not include access to guns. *See* Francis C. Gray, *Prison Discipline in America* 16 (Boston, Charles C. Little & James Brown, 1847) (noting that, in early American jails, "the custom of *garnish* was established and unquestioned; that is, the custom of stripping every new comer of his outer clothing, to be sold for liquor"); Letter from Jonathan Gillet to Family (Dec. 1776), *in Imprisoned in America: Prison Communications: 1776 to Attica*, 3, 3–4 (Cynthia Owen Philip ed., 1973) (providing the account of a Connecticut soldier "made prisoner" who wrote that "they first disarmed me then plundred me of all I had").

Justices of the peace and other officials had a lot of discretion when deciding whether to confine the mentally ill. An early Massachusetts statute empowered "selectmen" to "take care of the" mentally ill to prevent them from "damnify[ing] others." Act of May 3, 1676, *reprinted in* 5 *Records of the Governor & Company of the Massachusetts Bay in New England* 80–81 (Nathaniel V. Shurtleff ed., Boston, William White, 1853). A 1788 New York statute authorized justices of the peace, many of whom had no formal legal training, to "lock[] up" and "chain[]" the "furiously mad" in a "secure place." Act of Feb. 9, 1778 N. Y. Sess. Laws 645; *see* Chester H. Smith, *The Justice of the Peace System in the United States*, 15 Calif. L. Rev. 118, 127 (1927) (noting that "justices of the peace are laymen, that they are not required to be otherwise, and that they are very seldom 'learned in the law'"). And a Connecticut law allowed them to order the confinement of "persons under distraction and unfit to go at large, whose friends do not take care for their safe confinement." Edward Warren Capen, *The Historical Development of the Poor Law of Connecticut* 62–63 (1905).

These colonies and states were not the only ones to do it. It was so common that one manual describing the duties of justices of the peace said that "[a]ny person may justify confining and beating his friend being mad . . . as is proper in such circumstances." James Parker, *Conductor Generalis: Or, the Office, Duty and Authority of Justices of the Peace* 291 (New York, John Patterson 1788); *see* Daniel Davis, *A Practical Treatise upon the Authority and Duty of Justices of the Peace in Criminal Prosecutions* 41 (Boston, Hilliard, Gray, Little, & Wilkins 1828) ("In order to prevent the commission of a crime, any person may lawfully lay hold of a lunatic who is about to commit any mischief . . . ."). In England too, they could "apprehend[]" and "lock[] up" people "disordered in [their] senses" or dangerous "[l]unatic[s]." Henry Care, *English Liberties, or the Free-born Subject's Inheritance* 329 (6th ed. Providence, John Carter 1774).

Initially, the colonies had no place for them. Sometimes, the solution was jail. *See* Deutsch, *supra*, at 608 (explaining that "[i]ncarceration in jail was the common solution"). Other times, building a one-person asylum. In Pennsylvania, for example, the son of a poor man was "bereft of his naturall Senses and [was] turned quyt madd," so a judge ordered "three or four p'sons bee hired to build a [l]ittle [b]lock[-]house at [A]mesland for to put in the . . . madman." *The Record of the Court at Upland in Pennsylvania, 1676 to 1681, and a Military Journal Kept by Major E. Denny, 1781 to 1795*, 102 (Edward Armstrong ed., Philadelphia, J.B. Lippincott & Co. 1860). In Massachusetts, a court placed a woman in a "a litle house 7 foote long & 5 foote wide," which her brother built with funds provided by the town's residents. *Records of the Town of Braintree, 1640 to 1793*, at 26 (Samuel A. Bates ed., Randolph, Daniel H. Buxford 1886).

Mental hospitals later became the norm. In mid-1700s Pennsylvania, people grew tired of having those "disorder'd in their [s]enses . . . wander[ing] about, to the [t]error of their [n]eighbours." Benjamin Franklin, *Some Account of the Pennsylvania Hospital* 3 (I. Bernard Cohen ed., Johns Hopkins Press 1954). Their solution was the creation of the Pennsylvania Hospital, which "confined . . . [p]ersons distemper'd in [m]ind" or "deprived of their rational [f]aculties." *Id.* at 3–

-12-

4.  Less than two decades later, Virginians established the Eastern State Hospital to house those "deprived of their [s]enses" who "terrif[ied] the [r]est of their [f]ellow [c]reatures" and could not "help themselves."  Francis Fauquier, Lieutenant Governor, Va., *The Speech of the Honble Francis Fauquier, Esq; His Majesty's Lieutenant Governour, and Commander in Chief of the Colony and Dominion of Virginia to the General Assembly* 4 (Nov. 6, 1766) (Williamsburg, Purdie and Dixon 1766); *see generally* Norman Dain, *Disordered Minds: The First Century of Eastern State Hospital in Williamsburg, Va., 1766-1866* (1st ed. 1971).

The number of mental hospitals steadily grew from there.  "The[y] were not medical facilities designed for treatment; rather, they were intended to separate those suffering from mental illness from the rest of society."  Wilbur R. Miller, *The Social History of Crime and Punishment in America: An Encyclopedia* 1080 (2012).  Their purpose was "to preserve the peace of the community" from those who posed a danger to others.  Alan Dershowitz, *The Origins of Preventive Confinement in Anglo-American Law Part II: The American Experience*, 43 U. Cin. L. Rev. 781, 787–88 (1974); *see United States v. Jackson*, 85 F.4th 468, 476 (8th Cir. 2023) (Stras, J., dissenting from denial of reh'g en banc) (discussing dangerousness).  Society's answer to mental illness, in other words, was to lock up anyone who was "dangerous or disturbing to others."  Dershowitz, *supra*, at 788.

Confinement led to the loss of liberties.  "[T]hose afflicted with mental disease were generally treated as if they had been thereby stripped of all human attributes, together with their rights and privileges as human beings."  Deutsch, *supra*, at 607–08.  Thomas Cooley put it more bluntly with his observation that "the idiot" and "the lunatic" were "almost universally excluded" from civil liberties "on obvious grounds."  Cooley, *supra*, at 29; *see Bruen*, 597 U.S. at 35–36 (explaining how post-ratification history can shed light on the Second Amendment's meaning).  Gun rights were no exception.

By the late 1800s, state legislatures allowed the prosecution of people who gave guns to the mentally ill.  An 1881 Florida law, for example, made it illegal "to

-13-

sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife." Act of Feb. 4, § 1, 1881 Fla. Laws 87. And in Kansas, it was unlawful to sell "any pistol, revolver or toy pistol . . . or other dangerous weapons to . . . any person of notoriously unsound mind." Act of Mar. 5, § 1, 1883 Kan. Sess. Laws 159. Along with the even longer tradition of confinement, these laws suggest that society made it a priority to keep guns out of the hands of anyone who was mentally ill and dangerous. *See Heller*, 554 U.S. at 626–27 (reaffirming that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill"); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("repeat[ing] th[at] assurance").

The "burden" imposed by § 922(g)(3) is "comparable," if less heavy-handed, than Founding-era laws governing the mentally ill. *Bruen*, 597 U.S. at 29. It goes without saying that confinement with straitjackets and chains carries with it a greater loss of liberty than a temporary loss of gun rights. And the mentally ill had less of a chance to regain their rights than drug users and addicts do today. *See* 1 Blackstone, Commentaries *294 (explaining that the law "always imagines . . . [their] accidental misfortunes may be removed"). Stopping the use of drugs, after all, restores gun rights under § 922(g)(3). *See Carnes*, 22 F.4th at 748.

The justification, which is to "keep guns out of the hands of presumptively risky people," is also comparable. *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (per curiam). It is reflected in colonial-era laws, whether it be disarming loyalists, *see Jackson*, 85 F.4th at 471–72 (Stras, J., dissenting from denial of reh'g en banc), or making sure the mentally ill could not harm themselves or others. At least as applied to drug users and addicts who pose a danger to others, § 922(g)(3) is just another example of this "longstanding" tradition. *Heller*, 554 U.S. at 626–27 n.26.

In Veasley's view, the analogy is flawed because confining someone has always required a judicial finding. And so does disarming the mentally ill today,

which requires an "adjudicat[ion] as a mental defective" or "commit[ment] to a mental institution." 18 U.S.C. § 922(g)(4). Drug users and addicts, by contrast, receive no warning that they are ineligible to possess a firearm. *See* 18 U.S.C. § 922(g)(3).

We reject Veasley's argument for two reasons. The first is the historical record, which shows that there was limited process accompanying the confinement of the mentally ill, particularly given the broad discretion afforded to justices of the peace. *See Bruen*, 597 U.S. at 27 (requiring a *historical*, not a *current*, analogue). Second, there is a finding required under § 922(g)(3), it just comes later. Getting a conviction requires proof beyond a reasonable doubt of "regular drug use," *Carnes*, 22 F.4th at 748, and possession of a firearm, not to mention close timing between the two. *See United States v. Mack*, 343 F.3d 929, 933 (8th Cir. 2003) (explaining that the government must "demonstrate that [the defendant] was a 'user of any controlled substance' during the period of time he possessed the firearms" (quoting 18 U.S.C. § 922(g)(3))). The procedure may not be identical, but it does not have to be. *See Bruen*, 597 U.S. at 30 (noting that a modern-day regulation need not be a "dead ringer for [a] historical precursor[]").

2.

Another "historical analogue" makes it even clearer that Veasley's facial challenge cannot succeed. *Id*. This one focuses on conduct, not status. As the above discussion makes clear, possession of a firearm under § 922(g)(3) must accompany other conduct: drug use. In this way, it resembles the Founding-era criminal prohibition on taking up arms to terrify the people. *See* George Webb, *The Office of Authority of the Justice of the Peace* 92–93 (Williamsburg, William Parks 1736) (discussing Virginia law); *see also* Act For the Punishing of Criminal Offenders, Ch. 11, 96 (1692), *reprinted in The Charters and General Laws of the Colony and Province of Massachusetts Bay* 237, 240 (Boston, T.B. Wait & Co. 1814); Statute of Northampton, 2 Edw. 3, c.3 (1328).

The offense, called Terror of the People, has a lengthy historical pedigree. *See Jackson*, 85 F.4th at 474 (Stras, J., dissenting from denial of reh'g en banc). Although it started as a common-law offense, England formalized it in the 1328 Statute of Northampton. *See Bruen*, 597 U.S. at 40–45 (discussing it). In its earliest form, it prohibited going "armed to terrify the King's subjects." *Id.* at 43–44. At first, arms did not include *firearms*, which did not reach Europe until the mid-1500s. *See id.* at 41 (collecting sources).

As firearms became more common, however, so did the idea of criminalizing their misuse. *See id.* at 46 (discussing early Massachusetts and New Hampshire laws). Under one Massachusetts law, for example, justices of the peace could "arrest[] all . . . disturbers, or breakers of the peace . . . armed offensively" and "commit [them] to prison." Act of Jan. 29, 1795, § 2, *reprinted in* 2 *The Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807*, at 652–53 (Boston, J.T. Buckingham 1807). Likewise, in Kentucky, "[r]iding or going armed with dangerous or unusual weapons, [wa]s a crime against the public peace, by terrifying the people of the land, which [wa]s punishable by forfeiture of the arms, and fine and imprisonment." Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky, to Which Is Prefixed a Brief Summary of the Laws of the United States* 482 (Lexington, William Gibbs Hunt 1822).

But the offense was not about mere possession, or even openly carrying a firearm. *See Bruen*, 597 U.S. at 45. It required more, the "offensive[]" *use* of a firearm in a way that terrorized others. Webb, *supra*, at 92; *see Bruen*, 597 U.S. at 45 (explaining that the offense required public carry accompanied by "such Circumstances as are apt to terrify the People" (quoting 1 Pleas of the Crown 136)); *id.* at 50 (noting that early American laws "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people"). One example was Robert Huntly's decision to ride while armed in the North Carolina countryside with a stated intent to kill James Ratcliff, with whom he had been feuding at the time. *See State v. Huntly*, 25 N.C. (3 Ired.) 418, 421 (1843). In that case as well as others, terrorizing behavior had to accompany the possession. *See id*; *see also O'Neill v. State*, 16 Ala.

-16-

65, 67 (1849) (reasoning that "no quarrelsome words merely" would constitute an affray but that "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offense" (citation omitted)); *cf. Simpson v. State*, 13 Tenn. (5 Yer.) 356, 360 (1833) (noting that the mere carrying of arms was not alone "a necessarily consequent operation as terror to the people").

Just like its historical counterparts, § 922(g)(3) does not criminalize mere possession. It requires another act, the taking of drugs, which itself can cause terrifying and dangerous behavior. *See* Landry, *supra*, at 108. The decision to engage in illegal and dangerous conduct, in other words, is what leads to a temporary deprivation, which ends once the illegal behavior does. In that way, § 922(g)(3) imposes a "comparable burden" on the right to bear arms. *Bruen*, 597 U.S. at 29.

At least for *some* drug users, the justification is also "comparable." *Id.* Controlled substances can induce terrifying conduct, made all the more so by the possession of a firearm. All it takes is a few minutes flipping through the pages of the Federal Reporter to locate some examples. *See, e.g.*, *United States v. Ferguson*, 889 F.3d 314, 315 (7th Cir. 2018) ("[H]igh and drunk" 17-year old shot his carjacking victim "several times" while "[t]he victim's niece and the niece's 4-year-old daughter witnessed."); *Hadley v. Gutierrez*, 526 F.3d 1324, 1327 (11th Cir. 2008) ("[W]hile high on cocaine, Hadley entered a Publix supermarket yelling, 'Help me, help me, Jehovah God please help me!' and [officers], upon arriving at the store, found Hadley running around and knocking items off of the shelves."); *United States v. Simmons*, 260 F.3d 937, 938 (8th Cir. 2001) ("While high on painkillers," the defendant conspired to commit a heist that included "shoot[ing] any police officers who responded to the scene.").

To be sure, not every drug user or addict will terrify others, even with a firearm. Consider the 80-year-old grandmother who uses marijuana for a chronic medical condition and keeps a pistol tucked away for her own safety. It is exceedingly unlikely she will pose a danger or induce terror in others. But those are

-17-

details relevant to an as-applied challenge, not a facial one. For our purposes, all we need to know is that at least some drug users and addicts fall within a class of people who historically have had limits placed on their right to bear arms.

\*       \*       \*

Consistent with *Seay*, "we reject [Veasley's] facial challenge to § 922(g)[(3)]." 620 F.3d at 925. But we add to its analysis by doing the historical work and "analogical reasoning" that *Bruen* requires. 597 U.S. at 29–30; *cf. Jackson*, 69 F.4th at 501–06 (doing the same when analyzing the constitutionality of § 922(g)(1), the felon-in-possession statute). What it tells us is that, for some drug users, § 922(g)(3) is "analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30. Whether it is for others is a question for another day.

IV.

We accordingly affirm the judgment of the district court.

GRUENDER, Circuit Judge, concurring in the judgment.

I concur in the judgment. I write separately because I believe the court's inquiry into historical analogues is unnecessary in light of our prior caselaw. In *United States v. Seay*, 620 F.3d 919 (8th Cir. 2010), we were confronted, as here, with a Second Amendment facial challenge to 18 U.S.C. § 922(g)(3). We rejected the defendant's facial challenge after concluding that "§ 922(g)(3) is the type of longstanding prohibition on the possession of firearms that *Heller* declared presumptively lawful." *Id.* at 925 (internal quotation marks omitted); *see District of Columbia v. Heller*, 554 U.S. 570, 627 & n.26 (2008). Because *Seay* predates *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the court asserts we must "add to [*Seay*'s] analysis by doing the historical work and 'analogical reasoning' that *Bruen* requires." *Ante* at 18. In my view, however, we are bound by *Seay*, and no further inquiry is necessary.

In *Heller*, 554 U.S. at 627 & n.26, the Supreme Court identified a non-exhaustive list of "presumptively lawful regulatory measures." Nothing in *Bruen* disturbed or cast doubt on the constitutionality of those regulatory measures deemed by *Heller* to be "presumptively lawful." *See, e.g.*, *Bruen*, 597 U.S at 10 (stating that the Court's holding was "consistent with *Heller*"); *id.* at 24 (stating that the Court was "reiterat[ing] . . . the standard for applying the Second Amendment"); *id.* at 26 (stating that the Court was "apply[ing]" the test "set forth in *Heller*"); *id.* at 27 (stating that the Court was "[f]ollowing the course chartered by *Heller*").

We have already categorized § 922(g)(3) as a presumptively lawful regulatory measure consistent with *Heller*. *See Seay*, 620 F.3d at 925. Because *Bruen* did not disturb *Seay*, we remain bound by *Seay*. *See United States v. Sitladeen*, 64 F.4th 978, 983-87 (8th Cir. 2023) (holding, in the context of § 922(g)(5)(A), that we were bound by a pre-*Bruen* case); *United States v. Jackson*, 69 F.4th 495, 506 (8th Cir. 2023) (Smith, C.J., concurring) (stating, in a post-*Bruen* challenge to § 922(g)(1), that "*Heller* remains the relevant precedent we are bound to apply"); *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) (rejecting a defendant's challenge to § 922(g)(1) as foreclosed by the court's pre-*Bruen* precedent); *United States v. Dubois*, 94 F.4th 1284, 1291-93 (11th Cir. 2024) (rejecting a defendant's challenge to § 922(g)(1) in light of the court's prior caselaw). Having determined that *Seay* controls this case, I also would avoid the court's *dicta* regarding potential as-applied challenges. *See Jackson*, 69 F.4th at 502 (concluding "that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)").

_____