# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1553
_____

United States of America

*Plaintiff - Appellee*

v.

Aldo Ali Cordova Perez, Jr.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: January 16, 2025
Filed: July 22, 2025
_____

Before LOKEN, SHEPHERD, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

A jury convicted Aldo Ali Cordova Perez, Jr., of possessing a firearm as an unlawful drug user, in violation of 18 U.S.C. § 922(g)(3). Cordova Perez appeals, arguing that his conviction violates the Second Amendment. In light of our decision in United States v. Cooper, 127 F.4th 1092 (8th Cir. 2025), we vacate and remand for further proceedings.

# I.

On April 11, 2023, federal agents set up a "buy-bust" operation in Des Moines, Iowa, through a confidential informant. The agents arranged to buy over 15 pounds of methamphetamine from someone in a gold Dodge Durango in the parking lot of a bowling alley. That afternoon, officers surveilled the bowling alley in unmarked police vehicles, and as expected, a gold Dodge Durango soon pulled into the parking lot. Cordova Perez was driving the Durango.

Officers entered the lot and tried to trap the Durango with their vehicles, but Cordova Perez navigated around them and sped away. A chase ensued at "crazy fast" speeds, snaking through residential areas "all over the south side of Des Moines." During the chase, the Durango sideswiped one officer's unmarked vehicle and, eventually, Cordova Perez crashed the Durango into a concrete post beside the road. He exited the vehicle and tried to flee on foot, at which point officers tackled him to the ground and arrested him. In a subsequent search of the Durango, officers found a large quantity of methamphetamine in a box on the front-passenger-seat floorboard.

Cordova Perez and the officers "jok[ed] with each other" during his arrest. Cordova Perez told them to be easy on him and asked them where they worked out. He added that "he would have plenty of time to be working out" and asked which officer was driving a white car that he "couldn't shake" during the chase. Officers "found a small bag of marijuana" in Cordova Perez's pocket, and he admitted that he had smoked marijuana earlier that day. Later, he told a DEA agent that he used marijuana two or three times daily.

Cordova Perez was not carrying a firearm at the time of his arrest, and there was no firearm in the Durango. However, Cordova Perez told officers that he owned a "legally purchased" weapon—a .22-caliber rifle—that he kept in a closet at home. He had bought the rifle "[j]ust for home safety" years before and had used it only

once. Officers later found the rifle sitting atop a shelf in Cordova Perez's bedroom closet, speckled with dust.

At trial, Cordova Perez denied knowingly trafficking drugs. He testified that he had agreed to deliver a box to the bowling alley as a favor for a friend, but did not know the box's contents. According to Cordova Perez, "out of nowhere a bunch of vehicles just c[a]me in and surround[ed] me." Cordova Perez did not know the vehicles' drivers were officers, and he testified that he "got scared . . . put the car in drive, and . . . fled." When asked why he did not stop his vehicle upon hearing officers' sirens, Cordova Perez testified, "I was scared. I was pretty high, and I had some marijuana in my pocket, so I kind of—it was a too-late situation, and I just kind of kept going." He elaborated that he "wasn't really thinking at all," "just ha[d] to get away," was "[s]cared because [he] was high, and . . . just didn't know what to do at the time."

Cordova Perez was tried on two counts of possession with intent to distribute a controlled substance under 21 U.S.C. § 841(a)(1) and (b)(1)(A); one count of possessing a firearm in furtherance of drug trafficking under 18 U.S.C. § 924(c)(1)(A)(i); and one count of possessing a firearm as an unlawful drug user under 18 U.S.C. §§ 922(g)(3) and 924(a)(8). The jury ultimately acquitted Cordova Perez on all but the § 922(g)(3) count.

After his trial, Cordova Perez moved for judgment of acquittal, arguing that § 922(g)(3) was unconstitutional both facially and as applied to his case. The district court found that the statute survived facial challenge; the court then found that any as-applied challenge would fail "given the undisputed evidence that Cordova Perez: (i) unlawfully used marijuana at least two to three times per day while in constructive and/or actual possession of a firearm; and (ii) engaged in unpredictable and highly dangerous behavior while under the influence of the drug."

At sentencing, the district court stressed the dangerousness and recklessness of Cordova Perez's car chase. The court stated that "[w]hat Mr. Cordova Perez did

starting in that parking lot and then afterwards, fleeing at speeds above 60 miles an hour, crashing into a car . . . . was as reckless as I can imagine." To the court, Cordova Perez's conduct was "incredibly reckless and dangerous," and "[i]n some ways of all the conduct . . . in this case . . . the most inexcusable." For his part, Cordova Perez "apologize[d] to the state of Iowa, the officers that [he] put in danger during the course of [his] arrest, and [his] family." The court sentenced him to 36 months' imprisonment.

Cordova Perez appeals the denial of his motion for acquittal, and our review is de novo. United States v. Earth, 984 F.3d 1289, 1300 (8th Cir. 2021).

II.

Section 922(g)(3) prohibits firearm possession by anyone "who is an unlawful user of or addicted to any controlled substance." 18 U.S.C. § 922(g)(3). We have held that a defendant falls within the statute's ambit if he "was actively engaged in the use of a controlled substance during the time he possessed firearms." United States v. Carnes, 22 F.4th 743, 749 (8th Cir. 2022).

Cordova Perez does not appear to dispute that he was an active marijuana user during the time he possessed his rifle. Instead, he argues that applying § 922(g)(3) to his conduct—driving while high on marijuana, with a gun sitting unused back at home—is inconsistent with Founding-era firearm regulations and thus violates the Second Amendment, both facially and as applied to him. See generally N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022). Our precedent forecloses Cordova Perez's facial challenge, see United States v. Veasley, 98 F.4th 906, 918 (8th Cir. 2024);[1] United States v. Seay, 620 F.3d 919, 923–25 (8th Cir. 2010), but we recently held that Second Amendment "as-applied challenges to the drug-user-in-possession

---

[1]Cordova Perez argues we should reconsider our holding in Veasley in light of the Supreme Court's decision in United States v. Rahimi, 602 U.S. 680 (2024). But since Rahimi, we have rejected an identical facial challenge. See Cooper, 127 F.4th at 1094 n.1.

statute are available," Cooper, 127 F.4th at 1094. We thus turn to Cordova Perez's as-applied challenge.

"An as-applied challenge asks the reviewing court to declare the disputed statute unconstitutional 'on the facts of the particular case.'" United States v. Lehman, 8 F.4th 754, 757 (8th Cir. 2021) (quoting United States v. Adams, 914 F.3d 602, 605 (8th Cir. 2019)). Accordingly, looking to the facts of Cordova Perez's case, we must determine whether his conviction under § 922(g)(3) deprived him of his Second Amendment right. See id. To do so, we employ a test grounded in "text and historical understanding." Veasley, 98 F.4th at 909 (quoting Bruen, 597 U.S. at 26). We first ask whether "the Second Amendment's plain text covers [Cordova Perez's] conduct." Bruen, 597 U.S. at 24. If so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Id. The parties agree that the Second Amendment's plain text covers Cordova Perez's conduct, so we address only the latter inquiry: that is, whether Cordova Perez's conviction is analogically consistent with firearms regulation at the Founding.

The government ventures three Founding-era practices—regulations of intoxicating substances, the confinement of "those who were both mentally ill and dangerous," and so-called "going armed" or surety laws—and argues that they map onto Cordova Perez's conduct sufficiently to render § 922(g)(3) constitutional as applied to him. In turn, Cordova Perez argues that no Founding-era analogue supports his conviction because he merely used marijuana and he kept his rifle "stored away" in his home, so he "cannot be said to have been going armed to threaten others, or even to have presented any threat to the community with the firearm."

In Veasley, we surveyed the same three Founding-era regulatory traditions in the context of a facial challenge to § 922(g)(3). 98 F.4th at 910–17. We first rejected any comparison between § 922(g)(3) and Founding-era intoxication regulations. Id. at 910–12. Those laws—including a Virginia law banning "shoot[ing] any gunns at

drinkeing" and a New York law prohibiting firing guns in the days surrounding New Years due to "the 'great Damages' done by those 'intoxicated with Liquor'"—were insufficiently analogous to § 922(g)(3) because they concerned firearm *use*, not possession, and "were temporary and narrow in scope." Id. at 911 (alteration in original) (citations omitted).[2] However, we concluded that the user-in-possession statute found some support in the two other historical analogues the government invokes here (and invoked in Veasley): regulations of the mentally ill and going-armed laws. See id. at 912–17. We recounted that at the Founding, those whose mental illness caused them to act in erratic or dangerous ways could be confined and temporarily deprived of their civil liberties, including any right to possess a firearm, until they regained their faculties. Id. at 915 ("Society's answer to mental illness, in other words, was to lock up anyone who was 'dangerous or disturbing to others.'" (quoting Alan Dershowitz, The Origins of Preventive Confinement in Anglo-American Law Part II: The American Experience, 43 U. Cin. L. Rev. 781, 788 (1974))). Additionally, "Founding-era criminal prohibition[s] on taking up arms to terrify the people" barred those who were inclined to terrorize others from arming themselves. Id. at 916–17 (citations omitted). Because drug use "can induce terrifying conduct"—including, but not limited to, similar "behavioral effects" to

---

[2]Veasley also pointed out that because opiate use was "widespread" at the Founding, the fact that no firearm regulations concerning drug users existed at the time suggested "that disarmament is a modern solution to a centuries-old problem." 98 F.4th at 912. The government disputes Veasley's characterization of the history, arguing that drug use was not actually widespread in the United States at the Founding, and thus the regulatory silence is less telling. See id. at 911 ("When a 'challenged regulation [like § 922(g)(3)] addresses a general societal problem that has persisted since the 18th century,' like substance abuse, 'the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.'" (alteration in original) (quoting Bruen, 597 U.S. at 26)). But even if the government is correct, substance abuse involving alcohol—whose effects are analogous to controlled substances—*was* widespread at the Founding, and the government has failed to point to Founding-era regulations of alcohol use that involved disarmament in a way analogous to § 922(g)(3). Id.

mental illness—we concluded both Founding-era practices were analogous enough to § 922(g)(3)'s user-in-possession ban for the statute to at least sometimes pass constitutional muster. Id. at 912, 915–17.

In turn, our court held in Cooper that § 922(g)(3) is consistent with the Second Amendment as applied to at least two situations: when use of a controlled substance 1) "ma[d]e [the defendant] act like someone who is both mentally ill and dangerous"; or 2) would cause the defendant to "induce terror, or pose a credible threat to the physical safety of others with a firearm." 127 F.4th at 1096 (citations and internal quotations omitted); see also United States v. Rahimi, 602 U.S. 680, 693 (2024) ("[T]he Government offers ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others.").[3] Neither analogue[4] requires that the defendant contemporaneously carried a firearm. But see United States v. Connelly, 117 F.4th 269, 281 (5th Cir. 2024) (reading the history to "provide support for banning the *carry* of firearms *while actively intoxicated*"). Instead, the focus is on whether drugs made the defendant act dangerously, see Veasley, 98 F.4th at 916 (concluding § 922(g)(3) fit into a tradition of disarming "drug users and addicts who pose a danger to others"), or whether the

---

[3]These two situations track Justice Kennedy's insight into how drug use can relate to dangerous behavior. See Harmelin v. Michigan, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in judgment) (noting "drug-induced changes in physiological functions" and the risk that those who use drugs "commit crime in order to obtain money to buy [them]").

[4]Cooper also left open the possibility that the government could "identif[y] a new analogue we missed." 127 F.4th at 1096. But the government has not done so here. See Bruen, 597 U.S. at 24 (noting that the government bears the burden of finding analogues). For this reason, we have no occasion to address whether Founding-era confinement of "habitual drunkards," an analogue that has been raised in another recent case, see Petition for Certiorari at 10, United States v. Hemani, No. 24-1234, 2025 WL 1593262, at *10 (June 2, 2025), is consistent with disarming all those who "actively engage[] in the use of a controlled substance" while possessing firearms. Carnes, 22 F.4th at 749.

defendant's drug use could reasonably be seen to threaten others' physical safety, see Rahimi, 602 U.S. at 693.[5]

Nor does every application of § 922(g)(3) require an individualized factual determination of the type Cooper explicitly addressed. Before Cooper, we observed that "[t]h[e] historical record suggests that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms," or "presented an unacceptable risk of danger if armed." United States v. Jackson, 110 F.4th 1120, 1127–28 (8th Cir. 2024). For such "a class of prohibited persons," "there is no requirement for an individualized determination of dangerousness as to each person in [the] class." Id. at 1128. Analogizing here, certain categories of active drug users—classified either by drug type or the frequency or manner of a defendant's use—may be disarmed consistent with the Second Amendment if the government shows that any member of that "class" either "demonstrate[s] disrespect for legal

---

[5]Individualized applications of Cooper's test are fact-intensive, without room for unevidenced presumptions about who might be dangerous, or how that danger may manifest or be perceived. For example, while we have noted that "the 80-year-old grandmother who uses marijuana . . . and keeps a pistol tucked away" is not an *obvious* danger or threat to others, Veasley, 98 F.4th at 917–18, in certain circumstances she well could pose one. See Christopher P. Salas-Wright et al., Trends and Correlates of Marijuana Use Among Late Middle-Aged and Older Adults in the United States, 2002–2014, 171 Drug & Alcohol Dependence 97, 105 (2017) (noting that "older adult marijuana users are substantially more likely than their abstinent counterparts to . . . experience an array of behavioral health conditions"); Diana M. DiNitto & Namkee G. Choi, Marijuana Use Among Older Adults in the USA: User Characteristics, Patterns of Use, and Implications for Intervention, 23 Int'l Psychogeriatrics 732, 738 (2010) (noting that marijuana use may increase psychological distress "by producing adverse reactions such as panic and anxiety attacks and exacerbating existing mood disorders or psychosis, especially among older adults").

norms of society" or would pose "an unacceptable risk of danger if armed."[6] Id. at 1127–28.

We now turn to Cordova Perez's case. As to an individualized assessment, the district court, whose ruling predated Cooper, found that Cordova Perez had actively used marijuana at the same time he constructively or actually possessed his rifle, and that he had "engaged in unpredictable and highly dangerous behavior while under the influence of the drug." The district court's determination that Cordova Perez acted dangerously while using marijuana gets close to foreclosing his as-applied challenge under Veasley and Cooper. But because the district court and the parties lacked Cooper's guidance, the district court never made explicit findings in line with that opinion.

First, the district court did not address whether marijuana *caused* Cordova Perez to act "mentally ill and dangerous," Veasley, 98 F.4th at 915, an inquiry slightly different from the court's finding that he acted violently or recklessly while using marijuana. Analogizing to the "mentally ill and dangerous," the proper question is whether Cordova Perez's marijuana use caused him to act in an outwardly erratic or aggressive manner that would, in context, be reasonably perceived as disturbing or dangerous to others.[7] See id. at 917 (noting drug use can cause

---

[6]For example, our circuit has yet to address whether those who carry a firearm on their person while actively intoxicated could reasonably be seen to pose an unacceptable danger to others, and thus render § 922(g)(3) constitutional as applied to any member of that group. See Jackson, 110 F.4th at 1127–28; cf. Connelly, 117 F.4th at 281 (finding historical support for applying § 922(g)(3) to those who carry weapons while intoxicated).

[7]The historical sources we surveyed in Veasley do not delineate the specific manifestations of mental illness thought at the Founding to justify someone's confinement—we lack detailed accounts, for example, of what exact behavior made someone "furiously mad," Act of Feb. 9, 1778 N.Y. Sess. Laws 645, "under distraction and unfit to go at large," Edward Warren Capen, The Historical Development of the Poor Law of Connecticut 62–63 (1905) (describing Founding-era Connecticut law allowing confinement), or "disorder'd in their Senses . . . to the

"terrifying conduct" and citing Hadley v. Gutierrez, 526 F.3d 1324, 1327 (11th Cir. 2008), in which defendant acted erratically in grocery store while high on cocaine); United States v. Daniels, 124 F.4th 967, 978 (5th Cir. 2025) ("[W]e leave open the possibility that, for example, a heavy user of methamphetamine could potentially be disarmed because of his regular use of a drug causing erratic behavior . . . ."). If marijuana caused Cordova Perez to act or drive in an erratic way, for example, he might be disarmed constitutionally under § 922(g)(3) even if his outward behavior was not violent in the same way as, perhaps, the "combative hostility" sometimes associated with "a drug like PCP." See Veasley, 98 F.4th at 910 (quotation omitted); see also Commonwealth v. Miller, 955 A.2d 419, 423 (Pa. Super. Ct. 2008) (finding defendant's drug impairment relevant to sustaining aggravated assault conviction where defendant, high on marijuana, refused to pull over, led officers on chase, and crashed car). And even if Cordova Perez normally used marijuana without issue, marijuana could have triggered a single erratic or dangerous episode. E.g., People v. Rutigliano, 156 N.E.3d 122, 132–33 (Ill. App. Ct. 2020) (discussing evidence that defendant, who regularly used marijuana, smoked at a party, began to feel paranoid, panicked, thought he would "be attacked or be killed," and stabbed another partygoer to death). The district court did not make any such causal finding in this case.

Second, the district court did not explicitly find that Cordova Perez's marijuana use—either that day or more broadly—caused him to "induce terror, or pose a credible threat to the physical safety of others with a firearm." Cooper, 127 F.4th at 1096 (citations and internal quotations omitted). For example, the district court did not make an explicit finding that marijuana impaired Cordova Perez's

---

Terror of their Neighbours," Benjamin Franklin, Some Account of the Pennsylvania Hospital 3 (I. Bernard Cohen ed., Johns Hopkins Press 1954). See Veasley, 98 F.4th at 914–15 (discussing these sources). But these sources nonetheless described not just violent behavior, but also erratic behavior that, despite not being dangerous, would be reasonably perceived as such. See id. at 915 ("Society's answer to mental illness . . . was to lock up anyone who was 'dangerous *or disturbing* to others.'" (emphasis added) (quoting Dershowitz, supra, at 788)); see also Franklin, supra, at 3 (describing those whose mental illness makes them "a Terror to their Neighbors, who are daily apprehensive of the Violences they *may* commit" (emphasis added)).

decision-making on the day of the car chase such that it caused him to threaten others' safety, or that he induced terror by driving at high speeds while under the influence of marijuana.

Nor did the district court ask if Cordova Perez's marijuana use placed him in a category of people "present[ing] a special danger of misuse" sufficient to justify disarmament irrespective of any individualized showing of dangerousness. Jackson, 110 F.4th at 1129 (quoting Rahimi, 602 U.S. at 698). The district court found that the entire category of drug users—including marijuana users like Cordova Perez— may be constitutionally prohibited from firearm possession because Congress could deem them as a class to presumptively pose a risk to others if armed. The government makes a related argument on appeal. According to the government, all drugs can cause dangerous behavior, both due to their effects on users and the violent crime often appearing alongside their distribution and purchase. And more specifically, marijuana can have effects—including on cognition, motor skills, and mood—that "endanger public safety" such that § 922(g)(3) could constitutionally apply categorically to those, like Cordova Perez, who use the drug.

But we have already held that without more, neither drug use generally nor marijuana use specifically automatically extinguishes an individual's Second Amendment right.[8] Cooper, 127 F.4th at 1097, 1098 n.3. And the government here did not provide enough evidence to show that marijuana use alone could reasonably be seen to make any user "an unacceptable risk of dangerousness" to others by merely possessing a firearm.[9] Jackson, 110 F.4th at 1129. Indeed, defining a class of

_____

[8]We express no view on whether disarmament may be constitutional for those who use marijuana frequently, or who engage in high-risk activities while under the influence of the drug—issues left open on remand. We also do not opine on whether those who actively use marijuana while carrying a firearm on their person, or those who actively use other controlled substances, could be disarmed categorically. See Connelly, 117 F.4th at 281.

[9]Nor is it clear on this record that marijuana use necessarily represents a "disrespect for legal norms of society" sufficient for categorical disarmament. See

drug users simply by the suggestion that they might sometimes be dangerous, without more, is insufficient for categorical disarmament. See Cooper, 127 F.4th at 1096–97; see also Worth v. Jacobson, 108 F.4th 677, 694 (8th Cir. 2024) (rejecting Minnesota ban on carrying firearms in public for 18 to 20-year-olds, noting that "even using . . . recent statistics, it would be a stretch to say that an[y] 18-year-old 'poses a clear threat of physical violence to another'" (quoting Rahimi, 602 U.S. at 698)).

We believe the district court is best positioned to reassess Cordova Perez's as-applied challenge in light of Cooper. See Cooper, 127 F.4th at 1098 ("Although both sides invite us to resolve Cooper's as-applied challenge, the district court is in the best position to take the first crack at it."). Accordingly, we vacate the judgment and remand for the district court to determine—either individually or categorically, and either on the trial record or, to the extent necessary, via an evidentiary hearing—whether Cordova Perez's marijuana use: 1) caused him to "act like someone who is both mentally ill and dangerous"; or 2) would or did make him "induce terror, or pose a credible threat to the physical safety of others with a firearm." Id. at 1096 (citations and internal quotations omitted); see also Jackson, 110 F.4th at 1129 (noting that categories of people whose general behavior demonstrates sufficient disrespect for legal norms or dangerousness can be disarmed without individualized determinations).

As to any factual findings on remand, Cordova Perez raises a legitimate concern that the jury, not the judge, must resolve factual disputes necessary to sustain

_____

Jackson, 110 F.4th at 1127. Unlike many other controlled substances, marijuana use has been legalized in numerous states and is widespread. Cf. Walcott v. Garland, 21 F.4th 590, 600 (9th Cir. 2021) (concluding that "[t]he widespread legalization of marijuana makes it clear that offering to transport for sale a very small amount of marijuana does not involve conduct that violates accepted moral standards"); Canna Provisions, Inc. v. Bondi, 138 F.4th 602, 612 (1st Cir. 2025) (noting that "many states have in recent times provided legislative protections for" marijuana possession, cultivation, and use).

his conviction. See United States v. Pope, 613 F.3d 1255, 1259 (10th Cir. 2010) ("The jury is, of course, charged with determining the general issue of a defendant's guilt or innocence. Fact-finding by the district court based on evidence that goes to this question can risk trespassing on territory reserved to the jury as the ultimate finder of fact in our criminal justice system."). We recognize the difficulties inherent in this type of inquiry, made necessary by our developing case law. See Order Granting Motion to Dismiss at 2, United States v. Cooper, No. 6:23-cr-02040-CJW-MAR-1 (N.D. Iowa July 2, 2025), ECF No. 105 (expressing "concerns about the practical implications" and unprecedented nature "of operating under an ad-hoc, parallel system of judicial factfinding" in resolving as-applied challenges to § 922(g)(3)). However, at least some findings of dangerousness on an undisputed record fall within the district court's province and are typically separate from guilt or innocence with respect to § 922(g)(3) itself.[10] See United States v. Doss, No. 22-3662, 2024 WL 3964616, at *1 n.2 (8th Cir. Aug. 28, 2024) (per curiam) (rejecting posttrial as-applied challenge to § 922(g)(1) conviction and noting that "[i]t is safe to say that [the defendant] 'pose[s] a credible threat to the physical safety of others'" based on record of violent convictions (third alteration in original) (quoting Rahimi, 602 U.S. at 700)). Here, two of the issues on remand are whether the trial record demonstrates either that marijuana caused Cordova Perez to act like someone "mentally ill and dangerous" or that his marijuana use caused him to induce terror or pose a danger to others with a firearm. Cooper, 127 F.4th at 1096 (quotation omitted). Of course, if such a finding requires resolving disputed facts "inevitably bound up with evidence about the alleged offense itself," then a retrial may be necessary.[11] See Turner, 842 F.3d at 605 (quoting United States v. Grimmett, 150

---

[10]It may be, for example, that evidence relevant to an as-applied challenge to § 922(g)(3), if presented to a jury, would constitute otherwise inadmissible character evidence with respect to other charged offenses. See Fed. R. Evid. 404.

[11]While district courts may determine that jury instructions or special interrogatories are necessary to answer this question in some situations, this will not always be the case. See United States v. Turner, 842 F.3d 602, 605 (8th Cir. 2016); see also United States v. Baxter, 127 F.4th 1087, 1090–91 (8th Cir. 2025)

F.3d 958, 962 (8th Cir. 1998)); <u>see also</u> <u>Daniels</u>, 124 F.4th at 970, 975–76 (reversing § 922(g)(3) conviction because "[t]he jury did not necessarily find" potentially disputed facts relevant to timing of defendant's drug use).

We vacate and remand for further proceedings.

_____

(remanding for district court to determine whether Rule 12 hearing could resolve defendant's as-applied challenge to § 922(g)(3)).