COURT OF APPEALS OF VIRGINIA

Present:  Judges AtLee, Chaney and Lorish
Argued by videoconference

AKEEM RASHAWN WATKINS

                                                          OPINION BY
v.        Record No. 1734-23-3                   JUDGE LISA M. LORISH
                                                        JANUARY 28, 2025
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF MARTINSVILLE
G. Carter Greer, Judge

Fred D. Smith, Jr. (Fred D. Smith, Jr., P.C., on briefs), for appellant.

Angelique Rogers, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellee.


Akeem Rashawn Watkins challenges his convictions under two statutes that prohibited

him from possessing a firearm, arguing that the statutes are unconstitutional as applied to him

because they violate his rights under the Second Amendment of the United States Constitution.

His argument that Virginia's felon in possession statute, Code § 18.2-308.2, is unconstitutional is

foreclosed by our recent decision in *Ginevan v. Commonwealth*, ___ Va. App. ___ (Dec. 17,

2024).  There, we assumed without deciding that violent felons have rights under the Second

Amendment but applied *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and

*United States v. Rahimi*, 602 U.S. 680 (2024) to conclude that ample historical analogues allow the

Commonwealth to disarm at least those who have been convicted of violent felonies.  Code

§ 18.2-308.2 is therefore constitutional as applied to Watkins, because he too has been convicted

of a violent felony.

We also conclude that Code § 18.2-308.4, which prohibits possessing a firearm while

also possessing a controlled substance, is constitutional as applied to Watkins under the test set

out in *Bruen* and *Rahimi*. Here, Watkins admitted to being a cocaine user. While Code § 18.2-308.4 applies more broadly on its face, it is at least constitutional as applied to someone who admitted to using cocaine given the historical record of disarming dangerous, intoxicated, and mentally ill individuals. Thus, we reject Watkins's constitutional challenge to Code § 18.2-308.4 as well.

Finally, we affirm the circuit court's decision to reject Watkins's proposed jury instruction on the defense of duress. To successfully assert a duress defense under our caselaw, someone like Watkins who is not legally allowed to possess a firearm must rid himself of it as soon as any imminent threat of danger has passed. Watkins did not satisfy that requirement. For these reasons, we affirm the convictions.

BACKGROUND

On the night of Watkins's arrest, he was with his fiancée, Tamesha Milner, and three of their children at their home. Earlier that night, they were at a party at a friend's house where Watkins became intoxicated. He refused to leave the party when Milner asked him to go, so she left without him. Later that night, Watkins came home, and Milner heard him loudly arguing with someone on his cell phone. She told him to leave the house and calm down or she was going to call the police. Watkins left.

Later that night, Watkins tried to re-enter the home. Believing Watkins was an intruder, Milner grabbed a shotgun from the hall closet and went to the backdoor, which was opening as she approached. She drew the gun in a defensive position before realizing that the person entering was Watkins. When Watkins saw her with the gun, he grabbed it and said, "I thought you were going to shoot me," and noted that he was not supposed to have a gun. Milner responded, "I wasn't going to

shoot you fool. It's broke anyway." She then asked him to bring the gun around to the front door and help her open the broken door so she could let him in.[1]

That night, Officer King arrived at Milner's residence in response to an emergency report that a person was refusing to leave Milner's residence. When Officer King approached the front door, he heard voices coming from the back of the house, which he later learned were the voices of Watkins and Milner. To Officer King, it sounded like Milner was inside the house and Watkins was outside the house. As Watkins was rounding the side of the house with the shotgun, he saw Officer King. Officer King, Watkins, and Milner each provided estimates of the length of time between the conversation and Officer King encountering Watkins outside the house, ranging from 5 to 30 seconds.

When Officer King saw Watkins with the firearm, he ordered him to drop it, and then arrested him for public intoxication. Officers searched Watkins and found a plastic baggy of white powder, which later tested positive for cocaine. When Officer King asked Watkins what the substance was, he responded, "You know I do coke." After learning that Watkins had a prior felony conviction for burglary, officers charged Watkins with violating Code §§ 18.2-308.2 (possession of a firearm by a convicted felon) and 18.2-308.4 (possession of a firearm while possessing a controlled substance).

Watkins was tried by jury on these charges in the Circuit Court for the City of Martinsville. Before trial, Watkins moved to dismiss both charges, arguing that the prosecution would violate the Second Amendment under the United States Supreme Court's decision in *Bruen*. He contended that his firearm-related conduct was covered by the plain text of the Second Amendment and that there were no historical analogues for the statutes under which he

---

[1] At trial, the Commonwealth did not contest the version of events as testified to by Watkins and Milner or proffer any alternative set of facts, so we rely on the same here.

was charged. The Commonwealth countered that prohibitions on firearm possession were presumptively constitutional under the United States Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and that *Bruen* did not change that fact. The circuit court denied the motion to dismiss.

Watkins, Milner, and Officer King testified at trial, recounting the events in the manner summarized above. On cross-examination, the Commonwealth asked Watkins whether there was any threat around him when he encountered Officer King while carrying the gun. Watkins responded, "No, just the threat when she pulled it on me . . . . [T]here wasn't no threat after that. Just she told me to bring it around the house for her." When asked why he had not dropped the firearm or given it back to Milner once he took it from her, Watkins said that he did not feel comfortable dropping the gun or throwing it into the woods because there were children in the neighborhood.

Each party proffered their preferred jury instructions. Watkins asked that the jury receive an instruction on the defense of duress and that they be instructed that they could not find him guilty of being a felon in possession of a firearm "unless [they found] that he continued to possess the weapon after he had sufficient time to reflect on the consequences of his actions." The Commonwealth objected to both instructions. As to the first, the Commonwealth contended that no evidence supported a duress defense, citing Virginia caselaw that says that a felon does not have a valid duress defense if he possesses a firearm after any imminent threat has dissipated. On the second, the Commonwealth argued that the instruction did not accurately state the law. The court agreed with the Commonwealth and rejected both instructions.

The jury convicted Watkins on all counts. The circuit court sentenced him to imprisonment for seven years. This appeal followed.

ANALYSIS

I. Both Code §§ 18.2-308.2 and 18.2-308.4 are constitutional as applied to Watkins.

We review de novo an argument that the application of a criminal statute violates a defendant's constitutional rights. *Walker v. Commonwealth*, 302 Va. 304, 314 (2023). Challenging an enactment of the General Assembly is a "daunting task," as "all actions of the General Assembly are presumed to be constitutional." *Montgomery Cnty. v. Va. Dep't of Rail & Pub. Transp.*, 282 Va. 422, 435 (2011). In fact, "there is no stronger presumption known to the law." *Id.* Accordingly, a court may "not invalidate a statute unless that statute clearly violates a provision of the United States or Virginia Constitutions," and "every reasonable doubt regarding the constitutionality of a legislative enactment must be resolved in favor of its validity." *Marshall v. N. Va. Transp. Auth.*, 275 Va. 419, 427-28 (2008). It makes sense, then, that "the burden to show the constitutional defect is on the challenger." *Gray v. Commonwealth*, 30 Va. App. 725, 732 (1999).[2]

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Our recent decision in *Ginevan* reviewed the changing landscape of Second Amendment analysis, tracing the United States Supreme Court's approach from *Heller* up through its recent decisions in *Bruen* and *Rahimi*. To evaluate a constitutional challenge under the Second Amendment now, we first ask if "the Second Amendment's plain text covers an individual's conduct." *Ginevan*, ___ Va. App. at ___ (quoting *Bruen*, 597 U.S. at 17). If so, "the Constitution presumptively protects that conduct," and we must evaluate whether the Commonwealth has carried its burden to justify the regulation. *Id.* at ___. "[I]f the government wishes to regulate presumptively protected conduct, it must

---

[2] Watkins did not challenge the constitutionality of either statute under Virginia. Constitution Article I, § 13 and instead relies exclusively on the Second Amendment to the United States Constitution.

- 5 -

'demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.'" *Id.* at \_\_\_ (quoting *Bruen*, 597 U.S. at 17).

In evaluating whether a regulation is consistent with our Nation's historical tradition of regulating firearms, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (second alteration in original) (quoting *Bruen*, 597 U.S. at 29 & n.7). As we recently explained, "it is important to note that *Bruen* does not require a 'historical twin' in order to permit governmental restrictions—only a historical analogue." *Ginevan*, \_\_\_ Va. App. at \_\_\_ (quoting *Bruen*, 597 U.S. at 30). "Why and how the regulation burdens the right are central to this inquiry." *Id.* In other words, a regulation passed for a similar purpose, and that imposes a similar burden, may constitute an appropriate analogue. *See United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) ("[C]hallenged and historical laws" are relevantly similar if they "both (1) address a comparable problem (the 'why') and (2) "place a comparable burden on the right holder (the 'how').").

A. Watkins's challenge to Code § 18.2-308.2 is foreclosed by our decision in *Ginevan*.

We recently applied the *Bruen* framework to analyze the constitutionality of Code § 18.2-308.2 as applied to a person convicted of a violent felony. We assumed without deciding that the Second Amendment's plain text—a "right of the people"—presumptively covers the possession of a firearm by a felon. *See Ginevan*, \_\_\_ Va. App. at \_\_\_.[3] Because Ginevan could not

---

[3] Our opinion in *Ginevan* surveys the different ways courts have approached this question in the wake of *Bruen*, which we recount briefly here along with additional decisions issued since then. *Cf. Range v. AG United States*, 124 F.4th 218, \_\_\_ (3rd Cir. 2024) (en banc) (concluding that a nonviolent felon was part of "the people" protected by the Second Amendment); *United States v. Diaz*, 116 F.4th 458, 466 (5th Cir. 2024) ("The government also raises the familiar argument that Diaz is not among 'the people' protected by the Second Amendment. We disagree."); *United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024) ("On balance, the Second Amendment's plain text presumptively protects Williams's conduct . . . . Williams is a

"prevail on the historical test, the outcome [wa]s the same . . . whether he is—or is not—considered 'the people' for Second Amendment purposes." We therefore left that question for another day. *Id.* at ___.

As for the historical tradition of firearm regulation supporting the disarming of violent felons, we concluded that whether we looked to regulations at the time the Second Amendment was adopted in 1791, or at the time the Second Amendment was incorporated against the states in 1868, there was sufficient evidence to support the regulation. *Ginevan*, ___ Va. App. at ___.[4] We agreed with the Commonwealth that "[t]he English tradition of disarming dangerous individuals who pose a threat to public safety dates back centuries." *Id.* at ___. We relied on the following as evidence of this long tradition:

- [I]n the late 1600's, under England's Militia Acts, non-Anglican Protestants who declined to join the Church of England (as well as those who were considered dangerous) were disarmed.[5]

---

member of the people claiming 'the right' to possess a gun—to 'keep and bear arms.'"); *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) ("We assume, without deciding, that step one of the *Bruen* test is met.); *United States v. Rice*, 662 F. Supp. 3d 935, 945 (N.D. Ind. 2023) ("For the purposes of this motion the Court will assume, without deciding, Mr. Rice's possession of a firearm is facially covered by the protective ambit of the Second Amendment."); *United States v. Posey*, 655 F. Supp. 3d 762, 771 (N.D. Ind. 2023) ("As this case can be resolved on the second prong of *Bruen*, the Court will leave this question for the Seventh Circuit to resolve. The Court will assume, without deciding, that Defendant is part of 'the people' and the possession of a firearm is protected by the Second Amendment.").

[4] As was true in *Ginevan*, we continue to recognize the "ongoing scholarly debate" over which year is the appropriate reference point, and again conclude that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry" as it applies to the statute we consider today. ___ Va. App. at ___.

[5] *Id.* at ___ (citing *United States v. Jackson*, 110 F.4th 1120, 1126 (8th Cir. 2024) (citing Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994), and the Militia Act of 1662, 13 & 14 Car. 2 c. 3 § 13)).

- Even after "Parliament eventually recognized a right for 'good subjects' to own arms in the English Bill of Rights," "the Militia Act of 1662 nonetheless still authorized disarming those determined to be 'dangerous to the Peace of the Kingdome.'"[6]

- In the 1700's, statutes were passed prohibiting "'dangerous' individuals from possessing weapons."[7]

- Laws enacted during the "founding era of the U.S." included "Massachusetts and Pennsylvania confiscat[ing] weapons belonging to those who did not swear allegiance to the United States."[8]

- Despite the "uniquely American tradition" of firearm use, the colonists continued the English tradition of disarming those perceived to be dangerous to government or society.[9]

- "New Hampshire enacted a substantially identical statute" in 1759.[10]

- Virginia likewise "permitted constables to confiscate arms 'from such who ride, or go, offensively armed, in Terror of the People.'"[11]

---

[6] *Id.* at ___ (quoting An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, c. 2, § 7 (1689)); 12 Car. 2, c. 3 (Eng.)).

[7] *Id.* at ___ (citing Comment, *Bruen and the Gun Rights of Pretrial Defendants*, 172 U. Pa. L. Rev. 1701, 1720 (2024)). Indeed, "Constables were instructed to seize weapons from persons who were dangerous or 'Offensively Arm'd . . . upon Sight thereof[.]'" *Id.* (alterations in original) (quoting Robert Gardiner, *The Compleat Constable* 18 (3d ed. 1708)). The Statute of Northampton likewise allowed for the disarming of those who carried weapons in a "terrify[ing]"—"from the French word 'affraier'"—manner. *Rahimi*, 602 U.S. at 697 (citing 4 William Blackstone, *Commentaries on the Laws of England* 145 (10th ed. 1787))).

[8] *Id.* at ___ (quoting *United States v. Riley*, 635 F. Supp. 3d 411, 427-28 (E.D. Va. 2022)).

[9] *Id.* at ___ (quoting Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 261 (2020)), and citing Charles Winthrop Sawyer, *Firearms in American History* 1 (1910)). "[I]n 1692, Massachusetts authorized 'every justice of the peace' to arrest 'all affrayers, rioters, disturbers or breakers of the peace' who, 'upon [the] view of such justice,' 'ride, or go armed offensively' or cause 'fear or affray of their majesties liege people,' and to 'seize and take away his armour or weapons, and . . . cause them to be apprized and answered to the king as forfeited.'" *United States v. Rowson*, 652 F. Supp. 3d 436, 467-68 (S.D.N.Y. 2023) (quoting Acts and Laws Passed by the Great and General Court of Assembly of Their Majesties Province of the Massachusetts-Bay, 2d Sess. 52-53 (1692)).

[10] *Id.* at ___ (quoting *Rowson*, 652 F. Supp. at 467-68 (quoting Acts and Laws of His Majesty's Province of New-Hampshire in New-England 1-2 (1759)).

[11] *Id.* at ___ (quoting Greenlee, 20 Wyo. L. Rev. at 262 (quoting George Webb, *The Office of Authority of a Justice of Peace* 92-93 (1736)).

- Maryland, Virginia, and Pennsylvania also disarmed Catholics during the 1750's because they were viewed as a threat to the government.[12]

- "In 1776, the Continental Congress recommended that the colonies disarm persons 'who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies.'"[13]

We also considered regulations from the 1800's as relevant historical evidence.[14]  For example, we noted that "in the 1800's, states began enacting more extensive gun control legislation," including "[l]aws [that] banned the possession of arms by juveniles, people with mental illnesses, and the homeless."  *Id.* at ___.  And that "[s]uch laws were routinely upheld by state

---

[12] *Id.* at ___ (citing Greenlee, 20 Wyo. L. Rev. at 263 (citing Nicholas Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights and Policy* 197 (2d ed. 2017)).

[13] *Id.*at ___ (citing Greenlee, 20 Wyo. L. Rev. at 264 (quoting 1 Journals of the Continental Congress, 1774–1789, 285 (1906))).  Several colonies, including Virginia, followed this recommendation, providing the confiscated arms to the Continental Army.  Greenlee, 20 Wyo. L. Rev. at 265.  During that time period, the enslaved and Native Americans were also thought to pose immediate threats to public safety and stability and were disarmed as a matter of course.  *Id.* at 281 (citing Malcolm at 140-41).

[14] In interpreting the United States Constitution, the Supreme Court of the United States looks to the original public meaning of a given text.  Some of the Court's Justices have deemed relevant some post-ratification history as a tool for understanding the original public meaning of a constitutional provision at the time it was adopted.  In *Bruen*, for example, Justice Barrett concurred to highlight a question left "unsettled" after that case: "How long after ratification may subsequent practice illuminate original public meaning?"  597 U.S. at 82.  In *Rahimi*, the Court again looked to post-enactment history by considering "going armed" and surety laws—many of which were enacted by states well after the ratification of the Second Amendment—to be relevant historical analogues.  602 U.S. at 695-97.  Justice Barrett again concurred to note that while, for originalists, "the history that matters most is the history surrounding the ratification of the text," "postenactment history can be an important tool" by "'reinforc[ing] our understanding of the Constitution's original meaning.'"  *Id.* at 737-38 (quoting *Vidal v. Ester*, 602 U.S. 286, 323 (2024) (Barrett, J., concurring in part)).  Justice Kavanaugh likewise concurred and wrote that it can be "important for interpreting vague constitutional text" because "[t]he collective understanding of Americans who, over time, have interpreted and applied the broadly worded constitutional text can provide good guidance for a judge who is trying to interpret that same text decades or centuries later."  *Id.* at 724.  He emphasized that even "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text," citing James Madison's writings in the Federalist Papers.  *Id*. at 725.  Justice Kavanaugh also pointed out that the Court had relied upon post-enactment history "for more than two centuries," beginning with one of the Supreme Court's earliest and most consequential cases, *McCulloch v. Maryland*, 17 U.S. 316 (1819).  *Id.* at 725-28.

supreme courts." *Id.* at \_\_\_. In particular, a Missouri ban on carrying arms while intoxicated was upheld as a reasonable regulation that prevented "the mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). So too was an Ohio law disarming "tramps" because the right to keep and bear arms "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

From these examples, we readily concluded that "the historical record leading up to, contemporaneous with, and following the adoption of the Second Amendment, and the Fourteenth Amendment, demonstrates that the English and American tradition of those timeframes was to disarm people who were viewed as dangerous to the public or the stability of government." *Ginevan*, \_\_\_ Va. App. at \_\_\_. In sum, while there were no outright firearm bans based on felony status at the time of the founding, "the disarming of those who posed a threat of violence to others" was the relevant historical analogue. *Id.* at \_\_\_. Thus, while we left open whether the historical record supported the disarming of those convicted of *nonviolent* felonies, we found that Code § 18.2-308.2 was constitutionally applied to Ginevan. In reaching this conclusion, we joined the ranks of every other court to consider the question.[15]

Watkins, like Ginevan, stands convicted of a violent felony, as defined by Code § 17.1-805(C).[16] Thus, based on our holding in *Ginevan*, "the Commonwealth has satisfied its

---

[15] Since our decision in *Ginevan* was released, the United States Court of Appeals for the Third Circuit concluded, en banc, that the federal felon-in-possession statute was unconstitutional as applied to a nonviolent felon. *Range*, 124 F.4th at \_\_\_.

[16] Watkins does not argue that he is entitled to an individualized determination of dangerousness, so we do not take up that question here. *Cf. Williams*, 113 F.4th at 657, 660-61 (observing that "complete deference to legislative line-drawing would allow legislatures to define away a fundamental right" and that "as-applied challenges provide a mechanism for courts to make individualized dangerousness determinations").

burden of proving that Code § 18.2-308.2, as applied to [Watkins], meets the rigors of the Constitution and our legal tradition." *Id.* at ___.

   B. Code § 18.2-308.4 is constitutional as applied to Watkins because early English and American traditions of firearm regulation provide historical analogues for disarming current drug users.

Code § 18.2-308.4(A) makes it "unlawful for any person unlawfully in possession of a controlled substance classified in Schedule I or II . . . to simultaneously with knowledge and intent possess any firearm." A violation of this subsection is a Class 6 felony. Should someone unlawfully possess such a controlled substance and "simultaneously with knowledge and intent possess any firearm on or about his person," a two-year mandatory minimum term of imprisonment applies. Code § 18.2-308.4(B). An enhanced mandatory minimum applies when the firearm is possessed "while committing or attempting to commit the illegal manufacture, sale, distribution, or the possession with the intent" to do the same. Code § 18.2-308.4(C).

As we did in *Ginevan*, we assume without deciding that the Second Amendment's plain text protecting a "right of the people" presumptively covers a felon's possession of a firearm. *Ginevan*, ___ Va. App. at ___. Turning to whether the historical tradition of firearm regulation supports disarming drug users, we also agree that it makes no difference whether we look to regulations at the time the Second Amendment was adopted in 1791, or at the time the Second Amendment was incorporated against the states in 1868. *See Bruen*, 597 U.S. at 37 (declining to resolve this "ongoing scholarly debate" because it was not necessary to decide the case). Mindful that an exact match is not required, we conclude that there are sufficient comparable regulations that were passed for similar purposes and imposed similar burdens on similar individuals such that historical analogues support the disarming of a current drug user.

Before we turn to evaluate those analogues, we note that "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it

bears the burden to justify its regulation." *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 24). When assessing whether the government has met its burden, the Court is "not obliged to sift the historical materials for evidence to sustain" the challenged law. *Bruen*, 597 U.S. at 60. "That is [the Government's] burden." *Id.*[17] While the burden remains squarely on the Commonwealth to defend the constitutionality of a challenged regulation, we cannot ignore our own precedent, including *Ginevan*, which recently provided an exhaustive review of the relevant historical record, including some sources not cited by the Commonwealth in this case. *See Jones v. Commonwealth*, 291 Va. 232, 242 (2016) (noting the Court's "duty to follow binding precedent"). Likewise, we can avoid the risks inherent to judges acting as amateur historians— while ensuring the burden remains firmly on the Commonwealth—by considering precedential opinions from other jurisdictions facing similar questions. *See Ginevan*, ___ Va. App. at ___ (citing other jurisdictions).[18]

---

[17] *Bruen* invokes the principle of party participation in the context of countering the dissent's "objection that the Court will be unable to conduct the necessary research in other cases." Lawrence B. Solum and Randy E. Barnett, Originalism and the Party Presentation Principle 25, 27 (Jan. 15, 2025), https://perma.cc/MUT3-6G9P (arguing that "[t]he underlying justifications for originalism are inconsistent with a robust version of the party presentation principle").

[18] Watkins argues that he should prevail on his constitutional challenge because the Commonwealth's attorney below failed to provide any historical analogues to the trial court in the response to Watkins's motion to dismiss his charges. Instead, the Commonwealth simply relied upon language from *Heller*, which said that restrictions such as those at issue in this case were presumptively constitutional. We cannot agree that, in imposing the burden to provide historical analogues for a contested statute on "the Government," the Supreme Court of the United States intended to confine appellate courts to consider only the historical analogues provided at the trial level by line prosecutors. As in other instances, the Commonwealth may provide additional authorities to support its legal arguments on appeal. *See Lash v. County of Henrico*, 14 Va. App. 926, 929 (1991) (explaining that reliance, during an appeal, on additional authorities not presented at the trial level is not prohibited by our Rules so long as the legal position was "otherwise adequately presented at trial"). And, as noted above, we will not ignore our own precedent or decisions from the myriad of other courts facing similar questions.

To start, we recognize that the vast majority of courts have affirmed the constitutionality

of statutes that criminalize possessing a firearm by a drug user.[19]  Most of these cases analyze 18

---

[19] *See, e.g.*, *United States v. Veasley*, 98 F.4th 906, 911 (8th Cir. 2024) (finding 18 U.S.C. § 922(g)(3) to be facially constitutional primarily based on historical analogues prohibiting the use of a weapon in a dangerous manner and the use of a weapon by the mentally ill); *United States v. Montoya*, No. 1:21-CR-0997-KWR, 2024 U.S. Dist. LEXIS 82387, at *11 (D.N.M. May 6, 2024) (finding that § 922(g)(3) is facially constitutional because the government "met its burden in demonstrating that disarming presumptively risky people, like habitual drug users, is part of this nation's history and tradition of firearm regulation"); *United States v. Cousar*, No. 23-10004-01-EFM, 2024 U.S. Dist. LEXIS 60393, at *11 (D. Kan. Apr. 2, 2024) (finding § 922(g)(3) to be constitutional under the Second Amendment because it is "distinctly similar to founding-era regulations aimed at preventing intoxicated persons from possessing and using firearms"); *United States v. Connelly*, No. EP-22-CR-229(1)-KC, 2024 U.S. Dist. LEXIS 63518, at *3 (W.D. Tex. Apr. 2, 2024) (explaining that *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), "strongly intimates that not only those who are actively intoxicated, but also those who are rendered dangerous or violent by their drug use, may be prohibited from possessing firearms without running afoul of the Second Amendment" and that "because Connelly has not shown that § 922(g)(3) is unconstitutional in all of its applications, Connelly's facial challenge also fails" (cleaned up)); *United States v. Blue Bird*, No. 3:22-CR-30112-RAL, 2024 U.S. Dist. LEXIS 2766, at *2 (D.S.D. Jan. 3, 2024) ("Section 922(g)(3) is a constitutional restriction to the possession of firearms analogous to founding-era statutes regulating the mentally ill, intoxicated, and lawbreakers from possessing firearms, and therefore, does not violate the Second Amendment."); *United States v. Slone*, No. 5:22-CR-144-KKC-MAS, 2023 U.S. Dist. LEXIS 207370, at *4 (E.D. Ky. Nov. 20, 2023) (finding that "[t]he Government has shown that § 922(g)(3) is 'relevantly similar' to historical regulations aimed at preventing potentially dangerous persons from possessing and using firearms, including the mentally ill and the intoxicated," that [a]ddiction to controlled substances has long been accepted as a mental illness," and that "the Government has met its burden of demonstrating that § 922(g)(3) is consistent with this country's historical tradition of firearm regulation"); *United States v. Lewis*, 650 F. Supp. 3d 1235, 1242 (W.D. Okla. 2023) (finding that § 922(g)(3) is "relevantly similar" to historical laws preventing those deemed "dangerous or untrustworthy" from possessing firearms, "such as individuals convicted of felonies or suffering from mental illness" or those "who are intoxicated"); *United States v. Grubb*, No. 23-CR-1014-CJW-MAR, 2023 U.S. Dist. LEXIS 188933, at *4 (N.D. Iowa Oct. 20, 2023) ("[B]arring unlawful drug users who pose a danger to society is consistent with the history of firearm regulation at the time the Second Amendment was adopted" because "Congress made it illegal for unlawful drug users to possess firearms for the common sense and obvious reason that someone using illegal drugs, in possession of a firearm, poses a real danger to the community." (citation omitted)); *United States v. Costianes*, 673 F. Supp. 3d 756, 762 (D. Md. 2023) ("The Government has shown that § 922(g)(3) is 'relevantly similar' to historical regulations aimed at preventing potentially dangerous persons from possessing and using firearms, such as individuals convicted of felonies, individuals suffering from mental illness, and intoxicated individuals."); *United States v. Seiwert*, No. 20-443, 2022 U.S. Dist. LEXIS 175417, at *2 (N.D. Ill. Sept. 28, 2022) ("[Section] 922(g)(3) is relevantly similar to regulations aimed at preventing dangerous or untrustworthy

- 13 -

U.S.C. § 922(g)(3), which makes it a federal offense for a person "who is an unlawful user of or addicted to any controlled substance" to possess a firearm that has moved in interstate commerce. Two state courts of appeals have likewise concluded that their comparable state statutes do not violate the Second Amendment.[20] The only courts to reach a different conclusion have found that 18 U.S.C. § 922(g)(3) was not constitutional as applied to a user of marijuana—a substance no longer scheduled in Virginia.[21]

---

persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness."); *Posey*, 655 F .Supp. 3d at 776 ("[T]he government has established that the restrictions imposed by § 922(g)(3) are consistent with the history and tradition of firearms regulation in the United States and that the Government has carried its burden on the second prong of the *Bruen* test."); *United States v. Randall*, 656 F. Supp. 3d 851, 855 (S.D. Iowa 2023) ("The historical analogues to 18 U.S.C. § 922(g)(3), in the form of laws that prohibited possession of firearms by felons and alcoholics, are sufficient to justify the law under *Bruen*."); *Hasson v. United States*, 2024 U.S. Dist. LEXIS 140819, at *17 (D. Md. Aug. 8, 2024) (concluding that possession of a firearm while being an unlawful user of a controlled substance "creates the kind of danger to public safety that the Nation has historically sought to mitigate through the enactment of laws prohibiting carrying a dangerous weapon when intoxicated").

[20] California Health and Safety Code § 11370.1 provides that "every person who unlawfully possesses any amount of [specified controlled substances] while armed with a loaded, operable firearm is guilty of a felony." The Fourth District Court of Appeals of California found that this law does not affect the individual right of "law-abiding, responsible citizens" to possess firearms. *People v. Allen*, 96 Cal. App. 5th 573, 581 (2023). Similarly, the Fifth District Ohio Court of Appeals determined that "[b]ased on the substantial authority finding regulations similar to" that state's statute, which makes it illegal for anyone who is "under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse" to "acquire, have, carry, or use" a firearm, is constitutional. *State v. Jenkins*, 238 N.E.3d 992, 998 (Oh. Ct. App. 2024).

[21] In *United States v. Connelly*, 117 F.4th 269, 273 (5th Cir. 2024), a panel of the Fifth Circuit concluded the history and tradition of firearms regulation "may support some limits on a *presently* intoxicated person's right to carry a weapon" but that "they do not support disarming a sober person based solely on past substance use" so 18 U.S.C. § 922(g)(3) was unconstitutional as applied to a nonviolent person who admitted that "she would at times smoke marijuana as a sleep aid and for anxiety." A different panel of the Fifth Circuit reached a similar conclusion for a different nonviolent person who was not intoxicated when possessing the firearm but who admitted smoking marijuana multiple days a month in *United States v. Daniel*, 77 F.4th 337 (5th Cir. 2023). The Supreme Court later vacated, reversed, and remanded that case for further consideration in light of the Court's decision in *Rahimi*. *United States v. Daniels*, 144 S. Ct.

- 14 -

These courts have identified three categories of historical regulations that may serve as potential analogues to modern restrictions on the possession of firearms by drug users: (1) laws that generally prohibited people from using firearms in a dangerous manner; (2) prohibitions on intoxicated persons carrying guns; and (3) laws that prohibited persons with mental illness from possessing firearms.

The first category of regulations recalls the historical evidence we recounted in *Ginevan* for the government disarming dangerous individuals at the time of the founding, and through the 1800's. Laws prohibiting the use of firearms in a dangerous manner or by persons presumed to be dangerous constitute the broader set of laws within which specific prohibitions on firearms for intoxicated persons or persons with mental illness from carrying guns are embedded. As we held in *Ginevan*, there is sufficient, commonly accepted, evidence that the government has always disarmed individuals that it found dangerous or who were terrorizing the public. ___ Va. App. at ___. In comparing the "how" and "why" of these regulations to the statute at hand, we find a "common thread . . . [of] legislative response to the heightened danger to the public arising from the possession of a gun by an individual who, because of a mental condition or due to current use of alcohol or illegal drugs, may be less stable than we rightfully expect those who possess and use guns to be." *United States v. Lewis*, 650 F. Supp. 3d 1235, 1241 (W.D. Okla. 2023).

The second category of founding-era statutes that courts have studied as historical analogues to the prohibition against current drug-users carrying firearms are laws that explicitly prohibit the use of intoxicants and possession of firearms. In the Commonwealth, we punished "[w]hat persons soever [who] shall, after publication hereof, shoot any gunns at drinkeing (marriages and funerals only excepted)." 1655 Va. Acts 401, Acts of March 10, 1655, Act XII, in 1 Hening, *The Statutes at*

_____

2707 (2024). *See also United States v. Harrison*, 654 F. Supp. 3d 1191 (W. D. Okla. 2023) (concluding that the "mere use of marijuana" does not make someone dangerous, or analogous to a "dangerous lunatic" or otherwise "unvirtuous").

*Large: Being a Collection of all the Laws of Virginia*, 401-02 (1823). The New York legislature

recognized that "great Damages are frequently done on the Eve of the last Day of December, and on

the first and second days of January by Persons going from House to House with Guns and other

Fire Arms, and often being intoxicated with Liquor." N.Y. Col. Laws, vol. v, pp. 532-33 (Mar. 8,

1773), as quoted in Arthur Everett Peterson and George William Edwards, *New York as an

Eighteenth Century Municipality*, Part II, p. 127 (New York: Longmans, Green & Co., 1917). To

the extent that evidence from the mid-19th century is relevant to the historical analysis, we also note

that there were many examples of state bans on carrying firearms while intoxicated.[22]

As some courts have observed, the evidence of a historical tradition of specifically

prohibiting the use of intoxicants and firearms is thin on its own.[23] Even so, such evidence is

relevant as specific instances of the more broadly established tradition of disarming dangerous

---

[22] The court in *Hasson*, 2024 U.S. Dist. LEXIS 140819, at \*16, cited the following examples: Kansas Gen. Stat., Crimes & Punishments § 282 (1868) (providing that "any person under the influence of intoxicating drink" may not "carr[y] on his person a pistol . . . or other dangerous weapon"); 1878 Miss. Laws 175-76, § 2 (making it unlawful to sell pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329, § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (forbidding officers from "carrying . . . arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road). We noted in *Ginevan* that the Missouri ban on carrying arms while intoxicated that was upheld as a reasonable means of to preventing "the mischief to be apprehended from an intoxicated person going abroad with fire-arms." ___ Va. App. at ___ (quoting *Shelby*, 2 S.W. at 469).

[23] We acknowledge that none of the federal circuit courts of appeals to consider this question have found historical evidence of founding-era regulations sufficient (on its own) to establish a tradition of specifically prohibiting firearms and intoxicants. *See, e.g.*, *Veasley*, 98 F.4th at 911 (observing that "[f]or drinkers, the focus was on the use of a firearm, not its possession" and that "the few restrictions that existed during colonial times were temporary and narrow in scope"); *Connelly*, 117 F.4th at 280-81 (finding the two laws involving drinking and firearm use that were advanced by the Government in that case inapposite because they were motivated by different purposes and had much narrower application than 18 U.S.C. § 922(g)(3)).

individuals. The Supreme Court has instructed us to look for analogues, not matches, and we need not rely solely on this category of laws to uphold the constitutionality of Code § 18.2-308.4.

Likewise, we need not rest our conclusion entirely on whether there was sufficient evidence of founding-era laws that prohibited the mentally ill from possessing firearms, and instead find that this tradition serves as another discrete example of the broader principle that disarming the dangerous has always been consistent with the Second Amendment. "'Obviously, mental illness and drug use are not the same thing. But there is an "intuitive similarity" because their behavioral effects overlap.'" *United States v. Veasley*, 98 F.4th 906, 912 (8th Cir. 2024) (quoting *United States v. Daniels*, 77 F.4th 337, 349 (5th Circ. 2023)). To that end, the Eighth Circuit looked to early American laws that allowed for the confinement of mentally ill people who presented a danger to others, which necessarily meant those individuals were disarmed. *Id.* at 912-16. The Seventh Circuit has also noted that "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (citing Carlton F.W. Larson, *Four Exceptions in Search of a Theory*: District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009), and Henry Care, English Liberties, Or the Free-Broen Subject's Inheritance 329 (6th ed. 1774)); *accord* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1361 n.136 (2009); *see also United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001) (noting that "lunatics" and "those of unsound mind" were historically prohibited from firearm possession). Finally, we note that by the late 1800's, it was also common for states to criminalize giving a weapon to a person who was mentally ill. *See Veasley*, 98 F.4th at 915.

The Eighth Circuit relied on these statutes alone to conclude that there was sufficient historical evidence to support disarming drug users, underscoring that the psychological effects of

many scheduled drugs are comparable to the effect of mental illness. *Id.* at 912. Considering the "how" of these statutes, the court concluded that the burden imposed by 18 U.S.C. § 922(g)(3) was similar, if less heavy-handed, than founding-era laws disarming the mentally ill. *Id.* at 912-16. "It goes without saying that confinement with straitjackets and chains carries with it a greater loss of liberty than a temporary loss of gun rights. And the mentally ill had less of a chance to regain their rights than drug users and addicts do today." *Id.* at 915. As to the "why," the court found the restrictions are similarly motivated to "keep guns out of the hands of presumptively risky people." *Id.* at 915-16. We agree that these regulations provide at least some additional support.

Considering all of this historical evidence together, we find that Code § 18.2-308.4— when applied to a current drug user[24]—is relevantly similar to founding-era regulations aimed at preventing dangerous or untrustworthy persons from possessing firearms. In doing so, we join a growing chorus of courts relying on a combination of historical analogues to reach the same conclusion. *See, e.g.*, *Lewis*, 650 F. Supp. 3d at 1242 (finding the federal statute "relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness, or individuals who are intoxicated"); *United States v. Seiwert*, No. 20-443, 2022 U.S. Dist. LEXIS 175417, at *5 (N.D. Ill. Sept. 28, 2022) (concluding that the federal statute was "relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness"); *United States v. Posey*, 655 F. Supp. 3d 762, 771 (N.D. Ind. 2023) ("[T]he historical record shows a tradition of regulating firearm possession by individuals using intoxicating substances"

---

[24] We leave for a future case the question of whether there are sufficient historical analogues to disarm everyone else who merely possesses (either actually or constructively) both a controlled substance and a firearm.

- 18 -

and the federal statute is "analogous to historical regulations preventing dangerous persons, such as felons and the mentally ill, from possessing firearms.").

For these reasons, Code § 18.2-308.4 is constitutional as applied to Watkins, an admitted user of cocaine.

## II. The court did not err in refusing Watkins's proffered jury instructions on duress.

Watkins argues that the trial court erred by not instructing the jury with his proposed instructions on duress. "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Brown v. Commonwealth*, 68 Va. App. 746, 789 (2018) (quoting *King v. Commonwealth*, 64 Va. App. 580, 583 (2015)). "Jury instructions 'are proper only if supported by the evidence,' and 'more than a mere scintilla of evidence' is required." *Id.* (quoting *Boone v. Commonwealth*, 14 Va. App. 130, 132 (1992)). "If any credible evidence in the record supports a proffered instruction . . . failure to give the instruction is reversible error." *Id.* (quoting *Boone*, 14 Va. App. at 132). While we review the refusal to give a jury instruction for an abuse of discretion, we review whether that instruction accurately states the law de novo. *Mayberry v. Commonwealth*, 66 Va. App. 93, 101 (2016); *Payne v. Commonwealth*, 292 Va. 855, 869 (2016).

A duress defense "allows a convicted felon to possess a firearm for self-defense." *Humphrey v. Commonwealth*, 37 Va. App. 36, 49 (2001). The elements of a duress defense include:

> 1) a reasonable belief that the action was necessary to avoid an imminent threatened harm;
> 2) a lack of other adequate means to avoid the threatened harm; and

- 19 -

> 3) a direct causal relationship that may be reasonably anticipated between the action taken and the avoidance of the harm.

*Id.*[25]

The first element—that the defendant have a reasonable belief that the action was necessary to avoid imminent harm—has both objective and subjective components. "Whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted." *Id.* at 49 (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (2001)). And "[i]t is not essential to the right of self-defense that the danger should in fact exist." *Id.* "However, 'the test is not [merely] whether the accused thought or believed at the time of the killing that he was in imminent danger of great bodily harm . . . . He [both] must have believed and must have had reasonable ground to believe, at the time, that he was in such danger.'" *Id.* at 49-50 (alterations in original) (quoting *Perkins v. Commonwealth*, 186 Va. 867, 877 (1947)).

"Implicit in the application of such a defense to the crime of possessing a firearm after having been convicted of a felony is that the felon may possess the weapon only so long as is necessary to protect himself from the imminent threat." *Id.* at 50. Indeed, "[n]ecessity provides no defense to a charge of possession of a firearm by a convicted felon if the felon takes possession of the firearm before the threat becomes imminent or retains possession longer than required after the danger has passed." *Id.* (citing *United States v. Panter*, 688 F.2d 268, 272 (5th Cir. 1982) ("We emphasize that our holding protects a § 1202 defendant only for possession during the time he is endangered.")).

---

[25] In Virginia, duress is a similar but distinct defense from necessity. "The main difference is that duress means that the defendant committed a crime because someone directly forced them to do it. Necessity involves a choice between two bad alternatives that could not be avoided, which arose from the circumstances rather than the actions of a specific person." Ron Bacigal, "Duress," *Criminal Offenses and Defenses* at D40 (2023).

Watkins compares his case to *Humphrey*, where we concluded that a convicted felon had a valid duress defense when he shot a firearm in the air to scare off people who were shooting at him and his girlfriend from a truck. 37 Va. App. at 52-53. In *Humphrey*, however, we emphasized that the defendant "disposed of the weapon immediately after the danger had passed" by throwing the firearm on top of the roof of a nearby building. *Id.* at 51. Comparatively, there was no need for Watkins to carry the gun around to the front of the house. Watkins could have given the gun to Milner or discarded it. The only potential threat to Watkins was when Milner pointed the gun at him, thinking he was an intruder. This threat had dissipated by the time Watkins took the gun from her and walked around the side of the house.

For this reason, the trial court did not err in denying the jury instructions because there was no imminent threat to Watkins's safety at the time Officer King encountered Watkins still holding the firearm.

## CONCLUSION

We affirm the circuit court's ruling denying Watkins's motion to dismiss the indictments and refusing to issue the proffered jury instructions on duress.

*Affirmed*.